# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ASHLAND LLC, INTERNATIONAL )
SPECIALTY PRODUCTS INC., ISP )
ENVIRONMENTAL SERVICES INC., and )
ISP CHEMCO LLC, )
)
          Plaintiffs, )
)
v. )   C.A. No. N15C-10-176 EMD CCLD
)
THE SAMUEL J. HEYMAN 1981 )
CONTINUING TRUST FOR LAZARUS )
S. HEYMAN, et al., )
)
          Defendants. )

Submitted: December 15, 2016
Decided: March 31, 2017

*Upon Plaintiffs' Motion for Partial Summary Judgment on Count I of the Amended Complaint*
***DENIED***

*Upon Defendants' Cross-Motion for Partial Summary Judgment*
***DENIED***

Christopher Viceconte, Esquire, Gibbons P.C., Wilmington, Delaware, and Michael R. Griffinger, Esquire, William S. Hatfield, Esquire, and Camille V. Otero, Esquire, Gibbons P.C., Newark, New Jersey. *Attorneys for Ashland LLC, International Specialty Products, Inc., ISP Environmental Services, Inc., and ISP Chemco LLC*

Kevin G. Abrams, Esquire, John M. Seaman, Esquire, and April M. Ferraro, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware, and Andrew J. Rossman, Esquire, Jonathan B. Oblak, Esquire, and Sylvia E. Simson, Esquire, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York. *Attorneys for The Samuel J. Heyman 1981 Continuing Trust for Lazarus S. Heyman, et al.*

**DAVIS, J.**

This breach of contract case stemming from environmental liability allocation is assigned

to the Complex Commercial Litigation Division of this Court. Plaintiffs[1] Ashland LLC,

International Specialty Products, Inc. ("ISP"), ISP Environmental Services Inc. ("IES"), and ISP

---

[1] Plaintiffs collectively will be called Ashland unless specificity is required. Plaintiff Chemco is a subsidiary of Plaintiff ISP. Plaintiff IES is a subsidiary of Plaintiff Chemco.

Chemco LLC ("Chemco") filed this declaratory judgment and breach of contract case against Heyman Defendants—The Heyman Seller Defendants, The Heyman Trust Defendants, and Linden Property Holdings LLC ("LPH").[2]

## I.  BACKGROUND FACTS

The disputed property (the "Linden Property") is located at 4000 Road to Grasselli, Linden, New Jersey.[3]  The Linden Property has a chemical manufacturing history.  From 1919 to 1991, non-parties GAF Corporation and GAF Chemicals Corporation ("GAF Chemicals") owned and operated the Linden Property.[4]  GAF Corporation and GAF Chemicals discovered extensive contamination at the Linden Property during the 1970s-80s.[5]  Prior to the closing on the Stock Purchase Agreement (the "SPA"), the Heyman Defendants had owned GAF Corporation and GAF Chemicals since the 1980s.[6]

On June 16, 1989, GAF Chemicals and the New Jersey Department of Environmental Protection ("NJDEP") entered into an Administrative Consent Order (the "ACO") regarding environmental contamination and cleanup at the Linden Property.[7]  The ACO made GAF Chemicals and "its principals, directors, officers, agents, successors, [and] assignees . . ." responsible for environmental remediation until the NJDEP gave GAF written notice it satisfied the ACO.[8]  GAF Chemicals agreed to "conduct a remedial investigation and feasibility study of remedial action alternatives" and to "design and implement a remedial action alternative to

---

[2] The Court is initially using the definitions used by the parties in various pleadings. The Court will use the term "the Heyman Defendants" collectively unless specificity is required—*i.e.*, LPH or alike.
[3] Plaintiffs' First Amended Complaint ("Pls.' Compl.") ¶ 32.
[4] *Id.* ¶ 33.
[5] *Id.* ¶ 34.
[6] *Id.* ¶ 35.
[7] *Id.* ¶ 37. *See also* Pls.' Compl. Ex. B. *See also* Defendants' Answers/Counterclaims ("Countercls.") ¶ 24.
[8] *See* Pls.' Compl. Ex. B. at pp. 18, 22.

2

remedy any and all pollution at the site, emanating from the site, or which has emanated from the site."[9]

On October 17, 1990, GAF Chemicals announced that it was ceasing production at the Linden Property as of April 1, 1991.[10] That same date, NJDEP's Division of Hazardous Waste Management-Bureau of Environmental Evaluation and Cleanup Responsibility Assessment sent GAF Chemicals Corporation an "ECRA initial notice General Information Submission" to begin ECRA compliance.[11] The NJDEP assigned ECRA Case Number 90877 to the Linden Property.[12] On February 7, 1991, the NJDEP tasked the Division of Hazardous Waste Management-Responsible Party Cleanup Element to oversee GAF Chemical's cleanup of the Linden Property.[13] Further, the NJDEP advised GAF Chemicals as follows:

> [P]lease be advised that this decision does not relieve GAF Chemicals Corporation of any of its responsibilities under the Environmental Cleanup Responsibility Act. Be further advised that if GAF Chemicals Corporation fails to implement the existing Administrative Consent Order to the satisfaction of the Department, GAF Chemicals Corporation shall also be considered in violation of ECRA.
>
> At such time as GAF Chemicals Corporation completes all requirements of the existing Administrative Consent Order to the satisfaction of the Department, ECRA shall issue a Full Compliance Letter stating that GAF Chemicals Corporation's implementation of the existing Administrative Consent Order has also fulfilled all GAF Chemicals Corporation's requirements under ECRA.[14]

---

[9] Countercls. ¶ 24.
[10] Transmittal Affidavit of William S. Hatfield in Support of Plaintiffs'/Counterclaim Defendants' Partial Motion for Summary Judgment ("Hatfield Aff.") Ex D.
[11] *See id.* Ex. E. ECRA or Environmental Cleanup Responsibility Act was the predecessor to the Industrial Site Recovery Act ("ISRA"). *See Baykeeper v. NL Industries, Inc.*, 660 F.3d 686, 689 (3d. Cir. 2011) ("In 1988, [Defendant] undertook an environmental investigation of the site pursuant to New Jersey's Environmental Cleanup Responsibility Act, which has since been renamed the Industrial Site Recovery Act."). ISRA is found at N.J. Stat. Ann. §§13:1K-6 *et seq.*
[12] Hatfield Aff. Ex. F.
[13] *Id.* Ex. H.
[14] *Id.*

3

On May 8, 1991, the Heyman Defendants incorporated ISP as a subsidiary of GAF Chemicals and incorporated IES as ISP's subsidiary.[15] GAF Chemicals then transferred ownership of the Linden Property to IES.[16] IES and GAF Chemicals entered into an Assumption Agreement, with IES becoming the entity responsible for the ACO.[17] IES assumed "all liabilities and obligations relating to the manufacture and sale of specialty chemicals at Linden, NJ, known and unknown, contingent or otherwise, including liabilities for the remediation of the Linden [Property]."[18] In 1996, the Heyman Defendants spun off ISP (and IES) from GAF Chemicals.[19]

In 2002, the Heyman Defendants developed a Remedial Action and Work Plan (RAWP) to fulfill its clean-up obligations under the ACO.[20] On April 17, 2003, the NJDEP approved the RAWP. Specifically, the NJDEP stated that "*The Department approves the proposed remedial actions.*"[21] The NJDEP, on April 17, 2003, clearly believed that the ACO or ISRA mandates had not yet been completed at the Linden Property. On August 4, 2005, the NJDEP "determin[ed] that no further action is necessary for the remediation of the [on-site soil] so long as [IES] did not withhold any information from the Department."[22]

In September 2005, the NJDEP mandated that GAF Chemicals/ISP "provide a well detailed and time efficient schedule for the performance of an off-site investigation and contaminant delineation, as well as an ecological risk assessment."[23] NJDEP reiterated GAF

---

[15] Pls.' Amended Compl. ¶¶ 38–39; Counterclaims at ¶ 26.
[16] Pls.' Amended Compl. ¶ 40. Counterclaims at ¶ 26.
[17] Counterclaims at ¶ 26.
[18] *Id.* ¶ 27.
[19] Pls.' Amended Compl. ¶ 42.
[20] Hatfield Aff. Ex. O.
[21] *Id.* Ex. N (emphasis in original).
[22] Affidavit of Celeste Levine, Esq. in support of Opposition to Plaintiff-Counterclaim Defendant Ashland Inc.'s Motion for Partial Summary Judgment on Count I of the Amended Complaint and incorporated Cross-Motion for Summary Judgment ("Levine Aff.") Ex. I.
[23] Hatfield Aff. Ex. I.

Chemicals/ISP's obligation "to submit a (sic) ecological investigation and response schedule" in July 2007.[24]

In 2006, Chemco executed an Administrative Consent Order Amendment (the "Amended ACO") with the NJDEP.[25] The Amended ACO did not replace the ACO. Instead, the Amended ACO supplemented and became a part of the ACO.[26] The Amended ACO expressly provided that IES would continue to comply with the terms of the ACO.[27]

On July 1, 2011, the NJDEP issued a no further action letter to IES regarding on-site ground water.[28]

### *The Sale and Closing*

In 2011, Ashland acquired ISP, IES, and Chemco from the Heyman Defendants for $3.2 billion.[29] This was done through the SPA, dated as of May 31, 2011 between the Heyman Defendants (as the "Seller Parties") and Ashland (as the "Buyer").[30] On June 3, 2011, prior to the actual closing on the SPA, the Heyman Defendants drafted a memo regarding ISRA's applicability to the sale.[31] The Heyman Defendants' memo set out their rationale for why ISRA did not apply, including the land's vacant status and the NJDEP's granting the soil and groundwater no further action letters.[32]

---

[24] *Id.* Ex. J.
[25] Pls.' Compl. ¶ 45. *See also* Pls.' Compl. Ex. C. ¶ 4. *See also* Countercls. at ¶ 30.
[26] Pls.' Compl. Ex. C at ¶ 9 ("This ACO Amendment is intended to supplement the existing 1989 ACO. The provisions of this ACO Amendment shall become part of the 1989 ACO. The 1989 ACO, as amended, shall remain in full force and effect and [IES] shall continue to comply with the 1989 ACO."). *See also id.* at ¶ 15 ("By the execution of this ACO Amendment, NJDEP does not release any person from any liabilities or obligations such person may have pursuant to any other applicable authority, nor does NJDEP waive any of its rights or remedies pursuant thereto."). *See also* Pls.' Compl. ¶¶ 48–49.
[27] *Id.*
[28] Levine Aff. Ex. J.
[29] Pls.' Compl. ¶ 51. *See also* Countercls. at ¶ 46.
[30] *Id.*
[31] Levine Aff. Ex. N.
[32] *Id.*

5

The SPA set out the parties' respective obligations regarding the Linden Property. SPA

Section 2(e) to Schedule 5.19 of the SPA[33] states:

> In connection with the Linden Transfer, the Seller Parties shall assume all Liabilities to the extent related to or arising from or existing at the Linden Property, including Liabilities arising under or relating to (i) Environmental Laws, provided that such Liabilities shall not include any off-site migration or disposal of Hazardous Materials from the Linden Property prior to the Closing, any claims or damages associated with any off-site migration or disposal of Hazardous Material from the Linden Property prior to the Closing, and for the avoidance of doubt, any off-site contamination of soils, groundwater or sediments, any third party superfund sites including the Newark Bay Complex, any natural resources damages or exposure claims relating to operations or discharges prior to Closing,…or (v) the Linden Transfer (including any Liabilities to the extent arising by virtue of the delivery of a limited warranty deed, but excluding any Liabilities arising out of or relating to fraudulent conveyance or similar liability), in each case, other than as set forth in the proviso in clause (i) above, whether arising before, on or after the Closing Date (the "Linden Excluded Liabilities").[34]

SPA Section 2(f) also discusses the Linden Property transaction—specifically the

"Linden Transfer"[35]—and states:

> In connection with the Linden Transfer, the Seller Parties shall be responsible, at their sole cost and expense, for compliance, if applicable, with any requirements of the Industrial Site Recovery Act ("ISRA") and, if ISRA applies to the Linden Transfer, Seller Parties shall (i) within five (5) Business Days after execution of this Agreement, make any required filings or notifications (such as a General Information Notice, as defined under ISRA) to the [NJDEP], and (ii) use reasonable best efforts to, prior to closing, make all other filings, undertake all other measures, including where required undertaking any site investigation or Remedial Action required by ISRA. In addition, the [SPA] Seller Parties shall use reasonable best efforts to amend any consent decree or other binding agreement with any Governmental Entity relating to the Linden Excluded Liabilities, and to replace or substitute any related financial assurance (including any bond or letter of credit), to include the name of the Linden Transferee following the Linden Transfer and, if permitted by NJDEP, to remove the name of ISP or any of the Companies therefrom.[36]

---

[33] Any further reference to SPA Sections 2 and 4 of Schedule 5.19 of the SPA will omit reference to Schedule 5.19 and will be as "SPA Section 2_" or SPA Section 4_."
[34] *See* Counterclaims Ex. 18 at 14.
[35] The "Linden Transfer" is defined in SPA Section 2(a). *See* Pls.' Compl. Ex. A, p. 14.
[36] *See id.*

The parties also determined to use reasonable best efforts to comply with ISRA. Section 5.3(a) of the SPA states:

> Each of Buyer and the Seller Parties shall use their reasonable best efforts to consummate the Transactions and to obtain as reasonably promptly as practicable the Seller Required Approvals, the Buyer Required Approvals and all authorizations, consents, orders and approvals, notices and filings of or to all Government Entities that may be or may become reasonably necessary, proper or advisable under this Agreement or any Ancillary Agreement and applicable Laws to consummate and make effective the Transactions. Each of Buyer and the Seller Parties shall cooperate with the reasonable requests of each other in seeking to make or obtain as promptly as reasonably as practicable all such authorizations, consents, orders, approvals, notices and filings. Neither Buyer nor the Seller Parties shall take or cause to be taken any action that they are aware or should reasonably be aware would have the effect of impairing, impeding or materially delaying the receipt or making of any such required authorizations, consents, orders, approvals or filings. Without limiting the foregoing, the Seller Parties, at their sole cost and expense, (i) if and to the extent applicable to any of the Transactions, shall be responsible for compliance with requirements of the Industrial Site Recovery Act ("ISRA") and (ii) if and to the extent required by ISRA with respect to any such Transaction, shall either obtain from or file with the New Jersey Department of Environmental Protection ("NJDEP") and provide copies to the Buyer, prior to the Closing Date, (v) a No Further Action Letter (as defined in ISRA), (x) a Negative Declaration (as defined in ISRA), (y) an approved Remedial Action Workplan or Remediation Agreement (as such terms are defined in ISRA), or (z) any other written acknowledgment from NJDEP of an applicable waiver, exemption or authorization under ISRA.[37]

The parties also agreed to limit the survivability of certain claims. Section 7.1 states, in pertinent part:

> All covenants and agreements that by their terms apply or are to be performed in whole or in party after the Closing will survive for the period provided in such covenants and agreements, if any, or until fully performed. All covenants and agreements that by their terms apply or are to be performed in their entirety on or prior to the Closing shall terminate at the Closing[.] Notwithstanding the foregoing, any representation, warranty, covenant or agreement that would otherwise terminate in accordance with this Section 7.1 will continue to survive if a written notice shall have been timely given on or prior to such termination date[.][38]

---

[37] *See* Levine Aff. Ex. K at 66–67.
[38] *Id.* at 86–87.

The Heyman Defendants wanted to retain the Linden Property. On August 23, 2011, immediately after the SPA closed, IES conveyed the Linden Property back to the Heyman Defendants for one dollar via a Contribution Agreement.[39] Paragraph 2 of the Contribution Agreement mirrors Section 2(e) of the SPA.[40] Under the Contribution Agreement, LPH became responsible for:

> All liabilities to the extent related to or arising from or existing at the Linden Property, including Liabilities arising under or relating to (a) Environmental Laws (provided that such Liabilities shall not include any off-site migration or disposal of Hazardous Materials from the Linden Property prior to the Closing, any claims or damages associated with any off-site migration or disposal of Hazardous Material from the Linden Property prior to the Closing, and for the avoidance of doubt, any off-site contamination of soils, groundwater or sediments, any third party superfund sites including the Newark Bay Complex, any natural resources damages or exposure claims relating to operations or discharges prior to Closing).[41]

### *The Heyman Defendants' Post-closing Activity*

On July 18, 2011, prior to closing, IES notified NJDEP of the pending Linden Property transfer, and advised NJDEP that IES (or any ISP affiliate) would not be associated with the Linden Property after August 25, 2011.[42] The letter did not advise NJDEP that LPH was required to become an ordered party on the ACO or that the Heyman Defendants would be making a request to have IES removed as a party to the ACO.[43]

LPH did replace/substitute the outstanding letter of credit.[44] LPH made payments to New Jersey to comply with portions of the ACO.[45] And, LPH applied for Remedial Action Permits

---

[39] Pls.' Compl. ¶ 60. *See also* Countercls. ¶ 50.
[40] Countercls. ¶ 51.
[41] Pls.' Compl. ¶ 58.
[42] *Id.* ¶ 62. *See also* Pls.' Compl. Ex. D.
[43] *Id.* ¶ 63.
[44] *See id.* at ¶¶ 62, 64. *See also* Countercls. ¶ 60.
[45] Countercls. ¶ 60.

("RAPs") for soil and groundwater at the Linden Property.[46] On February 17, 2012, NJDEP issued RAPs for soil and groundwater at the Linden Property to LPH only.[47]

On July 3, 2012, LPH's environmental compliance manager requested from NJDEP a full satisfaction compliance letter.[48] On December 23, 2013, NJDEP denied LPH's full compliance request.[49] NJDEP's letter specifically required an investigation, ecological risk assessment, and remediation of off-site contamination.[50]

On January 21, 2014, LPH again requested a full satisfaction letter from NJDEP.[51] LPH mentioned that IES transferred the Linden Property to LPH, and LPH had taken over on-site responsibilities.[52] LPH also provided that IES was responsible for any off-site remediation pursuant to the ACO.[53] On April 9, 2014, LPH again wrote to the NJDEP. LPH stated that it agreed to assume on-site liabilities, while Ashland assumed off-site liabilities pursuant to the ACO.[54] Further, LPH provided that it believed that all on-site remediation was complete.[55]

On December 18, 2014, the NJDEP responded to LPH. The NJDEP informed LPH that: (i) LPA's liabilities were not limited to on-site remediation liabilities, and (ii) LPH, as the property owner, was obligated to complete a remedial investigation pursuant to the Spill Act and N.J.S.A. 58:10B-1.3.[56]

On July 23, 2015, the Office of the Attorney General of New Jersey (the "AG Office") advised LPH that its $7,744,000 remediation source established in 2011 was solely "a

---

[46] *Id.*
[47] *Id.* ¶ 61.
[48] *Id.* ¶ 65. *See also id.* Ex. 26.
[49] *Id.* Ex. 26.
[50] *Id.*
[51] *Id.* ¶ 66.
[52] *Id.*
[53] *Id.*
[54] *Id.* ¶ 88.
[55] *See id.*
[56] *See id.* ¶ 93.

9

replacement of the [remediation funding source] originally required by the ACO for remediation of the entire site, including remediation of offsite contamination."[57] The AG Office stated that the NJDEP was authorized to draw upon the $7,744,000 remediation source to complete remediation of the off-site migration liabilities.[58] Concurrently, the NJDEP sent Ashland and GAF (and its successors) a Demand for Stipulated Penalties for the parties' collective failure to comply with the ACO.[59] To date, the NJDEP has not sent out a full compliance letter.

### *The Litigation*

Ashland commenced this action on October 20, 2015, and filed its First Amended Complaint (the "Complaint") on December 3, 2015. The Complaint alleges five causes of action relating to purported obligations of the Heyman Defendants in connection with SPA Schedule 5.19 and purported responsibility for the investigation, remediation, and cleanup costs regarding environmental contamination of the Arthur Kill, an off-site location. Count I of the Complaint is a Declaratory Judgment – Breach of Contract claim asserted by Ashland against the Heyman Defendants for, among other things, the purported breach of Section 2(f) of Schedule 5.19 of the SPA. Among other things, Count I alleges that the Heyman Defendants' failure to amend the ACO to include the name of LPH and remove ISP and its subsidiaries therefrom is in breach of Section 2(f).

On January 6, 2016, the Heyman Defendants filed their Answer to the Complaint and Counterclaims. The Counterclaims assert six causes of action related to the same off-site liabilities associated with the LPH Property. Counts II and III of the Counterclaims are Breach of Contract and Declaratory Judgment – Breach of Contract claims asserted by the SPA Seller

---

[57] *Id.* ¶ 94.
[58] *Id.*
[59] *Id.* ¶ 109.

10

Successor Parties and RFH against Ashland in light of Ashland's purported breach of Section 2(e) of Schedule 5.19 of the SPA.

On July 11, 2016, Ashland filed its Opening Brief in Support of Plaintiffs' Motion for Partial Summary Judgment on Count I of the Amended Complaint Pursuant to Rule 56(c), Seeking a Declaratory Judgment that the Heyman Defendants Have Breached the Stock Purchase Agreement and are Obligated to: (i) Replace Any Financial Assurance Under the ACO; (ii) add LPH to the ACO as an Ordered Party; (iii) Remove ISP and Its Subsidiaries from the ACO; and (iv) Comply with the Requirements of the Industrial Site Recovery Act (the "MSJ Motion"). Ashland argues that no discovery is needed for the Court to declare the Heyman Defendants have breached their Section 2(f) obligations.

On August 12, 2016, the Heyman Defendants filed their Opposition to Plaintiff/Counterclaim Defendant Ashland Inc.'s Motion for Partial Summary Judgment on Count I of the Amended Complaint and Incorporated Cross-Motion for Partial Summary Judgment (the "MSJ Cross-Motion"). The Heyman Defendants contend two things. First, Ashland is not entitled to summary judgment because Sections 2(e) and 2(f) of the SPA clearly allocate the parties' clean-up obligations. Alternatively, the Heyman Defendants have used "reasonable best efforts" to comply with Sections 2(e) and 2(f), creating a factual issue. Second, the Heyman Defendants argue that the Heyman Defendants, and not Ashland, are entitled to summary judgment on Ashland's ISRA claim. The Heyman Defendants contend that Ashland waived or is estopped from arguing its ISRA claim or, alternatively, is time-barred.

The parties here have filed other dispositive motions. The Heyman Defendants filed their Defendants/Counterclaim Plaintiffs' Motion for Partial Judgment on the Pleadings (the "MJP Motion"). Ashland opposed the MJP Motion. In addition, Ashland filed its Plaintiffs' Motion to

11

Dismiss Certain of Defendants' Counterclaims (the "MTD Motion"), which the Heyman Defendants opposed. Many of the issues raised in the MSJ Motion and the MSJ Cross-Motion are also raised in the MJP Motion and the MTD Motion. The Court would note the most overlapping of issues is among the MJP Motion, the MSJ Motion and the MSJ Cross-Motion.

On October 4, 2016, the Court held an "omnibus" hearing on the MJP Motion, the MTD Motion, the MSJ Motion and the MSJ Cross-Motion. At the close of the hearing, the Court took all of the various motions under advisement. The parties submitted post-trial briefing and sur-replies in November, completing the process on December 15, 2016. The Court issued an opinion denying the MJP Motion (the "MJP Opinion") on March 29, 2017. On March 30, 2017, the Court issued an opinion granting, in part, and denying, in part, the MTD Motion. This is the Court's decision on the MSJ Motion and the MSJ Cross-Motion. For the reasons set forth below and in the MJP Opinion, the Court will deny the MSJ Motion and the MSJ Cross-Motion.

## II. STANDARD OF REVIEW—MOTION FOR SUMMARY JUDGMENT

Summary judgment is granted only if the moving party establishes that there are no genuine issues of material fact in dispute and judgment may be granted as a matter of law.[60] All facts are viewed in a light most favorable to the non-moving party.[61] Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if there is a need to clarify the application of law to the specific circumstances.[62] When the facts permit a reasonable person to draw only one inference, the question becomes one for decision as a matter of law.[63] If the non-moving party bears the burden of proof at trial, yet "fails to make a showing sufficient to

---

[60] Super. Ct. Civ. R. 56(c).
[61] *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991).
[62] Super. Ct. Civ. R. 56(c).
[63] *Wooten v. Kiger*, 226 A.2d 238, 239 (Del. 1967).

12

establish the existence of an element essential to that party's case," then summary judgment may be granted against that party.[64]

## A. ASHLAND'S CONTENTIONS

In the MSJ Motion, Ashland contends that the Court should grant summary judgment on Count I because the Heyman Defendants have breached several obligations under the SPA. Ashland argues that the Heyman Defendants agreed to (1) use reasonable best efforts to amend the ACO to replace or substitute financial assurance to cover cleanup costs; (2) add LPH to the ACO; and (3) remove ISP and its subsidiaries from the ACO. Further, Ashland claims that the Heyman Defendants agreed to comply with ISRA. Ashland contends that no discovery is needed because the Heyman Defendants' liability is clear.

In response to the MSJ Cross-Motion, Ashland argues that they did not know it would have an ISRA claim until the NJDEP notified them in 2015 that the sale of the Linden Property purportedly violated ISRA. Ashland filed suit three months after learning of this.

## B. THE HEYMAN DEFENDANTS' CONTENTIONS

In opposing the MSJ Motion, the Heymand Defendants contend discovery has not closed yet, so Ashland's motion is premature. Further, the Heyman Defendants argue that the facts (to date) demonstrate that they exercised reasonable best efforts to comply with SPA Section 2(f). The Heyman Defendants claim that this creates a genuine issue of material fact. In the MSJ Cross-Motion, the Heyman Defendants contend that Ashland's ISRA claim must be dismissed as matter of law for several reasons. First, the Ashland Defendants were obligated to undertake ISRA-related tasks "prior to" closing only to the extent ISRA was even applicable to the transfer. The Ashland Defendants contend they put Ashland on actual notice that the Heyman Defendants were not subject to ISRA months prior to closing. So, the Heyman Defendants posit that there is

---

[64] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

13

no ISRA-eligible claim. The Heyman Defendants further contend that, even if an ISRA claim began in 2011, then that initiated applicable time periods under which Ashland could bring a breach of action claim—*i.e.*, Ashland's claim would be subject to Delaware's three-year statute of limitations.[65] Having failed to do that, the Heyman Defendants argue Ashland's claims must be dismissed.

## III. DISCUSSION

### A. GENUINE ISSUES OF MATERIAL FACT PREVENT SUMMARY JUDGMENT ON ASHLAND'S COUNT I

As discussed in the MJP Opinion, there is a genuine issue of material fact about how SPA Section 2(e) and SPA Section 2(f) must be read in connection with all other sections of the SPA. This is true even with the expanded record on summary judgment.

Therefore, to the extent Ashland seeks summary judgment on the Heyman Defendants' duty to comply with SPA Section 2(f), the MSJ Motion is denied. There are some facts showing that the Heyman Defendants may have complied with SPA Section 2(f). For example, the correspondence between NJDEP and the Heyman Defendants show that the Heyman Defendants took some remedial/investigative work with respect to the ACO and the Linden Property. Moreover, the Heyman Defendants did provide a replacement/substitute financial assurance (the $7,744,000 letter of credit). The Court does note that, to date, the Heyman Defendants have provided no facts that support the conclusion that "reasonable best efforts" were undertaken to have ISP removed and LPH added to the ACO. The parties are engaging in discovery and this discovery should demonstrate whether there is a *genuine* issue of material of fact. The parties will be able to seek additional relief under Civil Rule 56 at the close of discovery as the deadline for dispositive motions (August 14, 2017) has not yet expired.

---

[65] 10 *Del. C.* § 8106.

14

In the MJP Opinion, the Court provided:

> The Court finds that there are ambiguities regarding the Heyman Defendants'
> duties and liabilities pursuant to SPA Section 2(f). Read in isolation, the Heyman
> Defendants' interpretation is plausible.[66]

The Court can consider a somewhat different record under Civil Rule 56 than it can under Civil Rule 12(c). As the record is developing,[67] Ashland's explanation of how the SPA, including SPA Sections 2(e) and SPA Section 2(f), works seems the stronger interpretation of the parties' obligations as to off-site migration liability with respect to ISRA and the ACO. As with the "reasonable best efforts issue," the parties may be able to develop the record in discovery so as to demonstrate that no genuine issues of matter fact exist on whether the SPA is ambiguous on this point. Moreover, additional discovery will likely flesh out whether the Heyman Defendants made any attempt to have LPH put on the ACO and ISP removed from the ACO.

## B. Genuine Issues of Material Fact remain regarding ISRA

The parties' other main dispute here is whether the Heyman Defendants complied with SPA Section 2(f)'s ISRA mandate. As discussed above, SPA Section 2(f) requires the Heyman Defendants to (a) comply with ISRA and (b), if ISRA applied, to notify the NJDEP regarding the transfer. The Heyman Defendants argue that ISRA did not apply to the transaction. Therefore, the Heyman Defendants had no duty to inform the NJDEP of the transfer. Alternatively, the Heyman Defendants argue that they told Ashland that ISRA did not apply prior to the sale and Ashland agreed with this. Because Ashland never objected, the Heyman Defendants contend that the SPA extinguished Ashland's right to pursue its ISRA claim.

---

[66] MJP Opinion at p. 11.
[67] *See, e.g.,* MJP Opinion at 12, LPH's interaction with NJDEP and the AG Office, the Contribution Agreement.

15

ISRA[68] requires the investigation and remediation of contamination whenever a covered property closes operations or transfers ownership.[69] ISRA's cleanup obligations pertain to *all* areas to which a discharge originating at the industrial establishment is migrating or has migrated.[70] Closing operations includes the "cessation of operations resulting in at least a 90 percent reduction in the total value of the product output from the entire industrial establishment.[71] The Linden Property ceased operations in 1991. Further, transferring ownerships means: any transaction or proceeding through which an industrial establishment undergoes a change in ownership.[72] Two changes of ownership occurred—the Heyman Defendants' selling ISP to Ashland, and then Ashland's selling the newly-formed LPH back to the Heyman Defendants.

ISRA appears to apply here. When the Linden Property ceased operations, the NJDEP's Division of Hazardous Waste Management-Bureau of Environmental Evaluation and Cleanup Responsibility Assessment sent GAF Chemicals Corporation an "ECRA [predecessor to ISRA] initial notice General Information Submission" to begin ECRA compliance. The NJDEP warned GAF Chemicals that only when a Full Compliance letter was sent would it consider GAF Chemicals to be compliant under ECRA. That warning continued through the sale and transfer of the Linden Property. No party has received a Full Compliance letter.

Further, the Heyman Defendants seem to misconstrue the NJDEP's classification of the Linden Property. The Heyman Defendants argue that the Linden Property's facility code was

---

[68] N.J. Stat. Ann. §§ 13:1K-6 *et seq*

[69] *Id.* § 13:1K-9.

[70] *Id.* § 13:1K-8 (defining "remedial action" to include "actions taken at an industrial establishment or off-site of an industrial establishment" if contamination has migrated from the site in question.").

[71] *Id.* (defining closing operations).

[72] *Id.* Alternatively, ISRA defines a "change in ownership" as "the sale or transfer of the business of an industrial establishment or any of its real property; or the sale or transfer of stock in a corporation, resulting in a change in the person holding the controlling interest in the direct owner or operator or indirect owner of an industrial establishment." *See id.*

16

9999; therefore, it was not subject to ISRA liability.[73] The Linden Property's facility code, as late as 2007, was 2841, not 9999.[74] As such, it does not appear that the NJDEP "agreed," as the Heyman Defendants argue, with the Heyman Defendants regarding the Linden Property's classification.

The Heyman Defendants contend the SPA's survival clause extinguished Ashland's ISRA claim. Alternatively, the Heyman Defendants argue that Delaware's three-year statute of limitations[75] bars the claim—the SPA closed in 2011, and Ashland filed this complaint in 2015. The Heyman Defendants argue that they told Ashland ISRA did not apply to the transaction and, therefore, Ashland should have lodged its complaint prior to the SPA's closing. Ashland did not, and has now waived its right to bring this ISRA claim.

Ashland argues that it had no way of knowing that ISRA applied to the transaction until it received files from the NJDEP pursuant to an Open Records Request. Specifically, Ashland received a chart showing the Linden Property's history.[76] Ashland argues that this confirms that the NJDEP knew in 2013 that ISRA still applied. There is a chart that seems to provide that NJDEP believed the GAF/ISP spin off and Ashland's acquisition were in violation of ISRA.[77] As such, the statute of limitations arguably did not begin to run until Ashland received this information in 2015; Ashland filed suit three months later.

---

[73] *See id.* (defining "Industrial establishment" as "any place of business engaged in operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances or hazardous wastes on-site, above or below ground, having a Standard Industrial Classification number within 22 39 inclusive, 46-49 inclusive, 51 or 76 as designated in the Standard Industrial Classifications Manual prepared by the Office of Management and Budget in the Executive Office of the President of the United States."). *See also* Levine Aff. Ex. N.

[74] *See* Levine Aff. Ex. N. ("GPA claims SIC Code of 2841 when facility reports SIC Code of 9999").

[75] 10 *Del. C.* § 8106.

[76] *See* Hatfield Aff. Ex. P.

[77] *See id.*

17

Section 8106 provides that no action "shall be brought after the expiration of 3 years from the accruing of the cause of such action."[78] The statute of limitations clock begins running once the breach occurs. Ignorance of the cause of action will not toll the statute, absent concealment or fraud, or unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.[79] In the latter circumstance, the statute of limitations begins to run upon the discovery of facts "constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of such facts.[80]

The Court believes that, on the record to date, waiver or statute of limitations may prevent Ashland from proving its ISRA claim. At this time, however, Ashland has created a genuine issue of material fact such that the Court will deny the Cross-Motion.[81]

## IV.    CONCLUSION

For the reasons set forth herein and in the MJP Opinion, the Court **DENIES** the MSJ Motion and the MSJ Cross-Motion. The Court is denying these motions without prejudice to the parties raising the issues again after the record has been more fully developed.

**IT IS SO ORDERED.**

Eric M. Davis, Judge

---

[78] *Coleman v. Pricewaterhousecoopers, LLC,* 854 A.2d 838, 842 (Del. 2004). *See also* 10 *Del. C.* § 8106.
[79] *Coleman,* 854 A.2d at 842.
[80] *Id.*
[81] For example, Ashland may not have been put on proper notice due to information provided by the Heyman Defendants in connection with the closing on the SPA. Moreover, NJDEP dealt mostly with LPH after the closing on the SPA. Ashland may not have gotten notice from NJDEP regarding LPH's on-site liability v. off-site migration liability position until 2014.

18